THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BRONSON JACKSON, | § | |
| | § | |
| *Plaintiff* | § | |
| | § | Civil Action No. 4:19-cv-1506 |
| v. | § | |
| | § | |
| UNION PACIFIC RAILROAD COMPANY, | § | |
| | § | |
| *Defendant* | § | JURY TRIAL DEMANDED |

## PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE JUDGE OF THIS COURT:**

COMES NOW Bronson Jackson ("Plaintiff" or "Jackson") complaining of unlawful employment practices by Defendant, Union Pacific Railroad Company and in support of his causes of action would respectfully show the Court as follows:

### I.
### JURISDICTION, PARTIES, AND VENUE

1. This Court has jurisdiction over the causes of action alleged by Plaintiff pursuant to 28 U.S.C. §1331, 29 U.S.C. §§2601-2654, The Family and Medical Leave Act ("FMLA" or "the Act"), 42 U.S.C. §§12111-12117 *et. seq.*, The Americans with Disabilities Act as amended ("ADAAA"), and the anti-retaliation regulations set forth by the FMLA and the ADAAA.

2. Plaintiff, Bronson Jackson is and was a disabled individual qualified for FMLA leave at all times relevant to the facts and causes of action stated herein. Mr. Jackson is and has suffered from chronic type 1 diabetes mellitus, a disability under the ADAAA at all times relevant to the facts and causes of action stated herein.

3. Defendant, Union Pacific Railroad Company ("Defendant" or "UP") is a corporation operating in Texas and was at all times, relevant to the facts and claims in this Original Complaint, Mr. Bronson's private-sector employer within the meaning of the FMLA and the ADAAA.

4. Plaintiff will serve Defendant with this Original Complaint by and through its attorneys of record and/or through its registered agent of service: CT Corporation System, 1999 Bryan Street, Ste. 900, Dallas, Texas 75201-31316

5. The employment practices alleged to be unlawful herein were committed within the Southern District of Texas, Houston Division.  Venue is appropriate in this Court.

### VICARIOUS LIABILITY--RESPONDEAT SUPERIOR

6. Whenever in this pleading it is alleged that Defendant did any act or thing, or failed to do any act or thing, it is meant that Defendant's officers, owners, servants, employees, or representatives and management including but not limited to Jason Jenkins, Keenan Jackie, Brian Gordon and/or Larry Vogel did such act or thing, or failed to do such act or thing, or that such act or thing or omission was done in the course and scope of that person's employment at UP, or in the furtherance of Defendant UP's interests, or with the full authorization, permission, tolerance, and/or ratification of Defendant, or was done by an authorized member of management of Defendant or was done in the normal routine of the accepted, tolerated, or permitted conduct, customs, and/or practices of Defendant's officers, owners, servants, employees, management and/or representatives.

7. All conditions precedent to the filing of this lawsuit have occurred.

### II.
### EXHAUSTION OF ADMINSTRATITIVE REMEDIES

8. Mr. Jackson filed an original Charge of Discrimination ("Charge") with the United States Equal Employment Opportunity Commission (hereinafter "EEOC") on or about February 13, 2019, wherein he averred that Defendant engaged in disability discrimination against him and

because of his disability by failing to consider a reasonable accommodation for him to maintain his employment despite notice and knowledge of his disability and his need for a reasonable accommodation. The EEOC assigned Mr. Jackson's Charge and all amendments thereto the No. 460-2019-00073.

9. The EEOC issued Mr. Jackson a Right-to-Sue letter on March 13, 2019, and he timely files suit in federal court within 90 days of his receipt thereof.

### III.
### FACTUAL BACKGROUND

10. UP hired Jackson on May 16, 2011 to work as a fulltime railroad conductor in Houston, Texas. As part of the application process, Jackson disclosed to UP that he had type 1 diabetes mellitus, a condition that he has suffered from since he was 19 years old. Initially, Jackson did not request an accommodation from UP based on his diabetes/disability.

11. In 2013 however, while still employed by UP, Jackson unexpectedly went into diabetic ketoacidosis (a life-threatening complication of diabetes that occurs when your body produces high levels of blood acids called ketones), which resulted in him being admitted into Memorial Hermann Hospital ICU for one day and taking 3 days of leave from work to attend to his medical needs.

12. Based on this life-threatening episode Jackson determined—with his physician's input—that he should apply for intermittent FMLA at UP so that he could address emergency and/or threatening episodes when necessary. Accordingly, Jackson applied and was approved for intermittent FMLA with UP beginning in January 2014 based on his diabetic condition and diagnosis.

13. Every year since January 2014, Jackson has reapplied and been reapproved for intermittent FMLA based on his diabetic diagnosis/disability.

14. From 2014-2017, UP granted Jackson intermittent FMLA to self-treat his diabetic condition and symptoms whenever his insulin levels became unsafe to his health and he needed to lay-off of work.

15. In 2017, based on his doctor's advice and recommendation, Jackson received a Continuous Glucose Monitoring (CGM) device which allowed him to check and monitor his glucose readings by the hour and/or day. The CGM helped Jackson stay aware of his insulin levels and his need for rest and/or treatment to stabilize his condition.

16. In 2018, Jackson's treating physician's staff mentioned to Jackson that his physician would soon be retiring and so Jackson began treating his diabetes condition with a new doctor: Sonia Eapen MD, PA.

17. Before Jackson's 2017-2018 FMLA certification (which he applied for in July 2017) was set to expire, Jackson provided Dr. Eapen with UP's FMLA paperwork for her to complete so that he could submit it to UP for UP to determine his continued eligibility for intermittent FMLA during the 2018-2019 period.

18. Without hesitation, Jackson's doctor provided Jackson with the completed paperwork, and Jackson faxed it to UP in July 2018. In response, UP approved Jackson's request for intermittent FMLA leave but only approved "treatment-based" leave for 1x/month and for only 8 hours each month.

19. This approval was different than Jackson's previous approvals and indicated that Jackson could only utilize FMLA leave once a month for an eight-hour period. It also erroneously indicated that Jackson was required to go to a doctor's visit when utilizing FMLA time. In the past, Jackson's doctor had always requested and UP had always approved Jackson for self-treatment for as many times a month as medically needed by Jackson. Allowing an employee to

self-treat his or her diabetic condition is in-line with the FMLA regulations.

20. Without realizing UP or his doctor's errors, after receiving his 2018-2019 FMLA approval, Jackson continued to self-treat and utilize his FMLA on an intermittent basis whenever his sugar levels spiked and he was required to rest to stabilize his level as he had done since 2014.

21. This meant that Jackson would utilize FMLA during weekend hours, night hours, and holidays when doctor's offices are typically closed; and rather than visit with a doctor on each occasion, he would self-treat by resting until his insulin levels stabilized.

22. On September 1, 2018, for example, Jackson requested FMLA time because his insulin level had spiked over 400, which was unreasonably unsafe to Jackson's health. (The normal insulin-level range is between 80-110).

23. Unbeknownst to Jackson, UP had been monitoring his use of FMLA time over certain holidays, including the Labor Day weekend, and as soon as Jackson requested September 1st off for FMLA purposes, UP instructed an investigator to conduct surveillance of Jackson's September 1st activities.

24. Jackson used his FMLA between September 1 and September 3, 2018 to self-treat his diabetic condition.  He generally stayed at home and rested. He did not engage in work or stressful activities.

25. On September 3, 2018, Jackson alerted UP that he was able to return to work, however later that same day, he felt ill and went back into UP's computer system to lay off of work again.  Jackson returned to work on September 4, 2018.

26. On or about September 6, 2018, the investigator reported to UP that Jackson did not leave his home between the hours of 10am and 10pm on September 1, 2018. The investigator had no information regarding Jackson's activities before 10am or after 10pm on September 1,

2018.

27. On September 11, 2018, without reviewing Jackson's past FMLA use or giving Jackson an opportunity to explain his repeated use of FMLA time during a holiday (as UP testified during a Union hearing was its reason for conducting surveillance on him on September 1st) or giving Jackson an opportunity to explain the reason that he did not leave his home on September 1, 2018, UP pulled Jackson out of service without pay pending "further investigation of his September 1, 2018 FMLA use" and charged him with Dishonesty and Misreported FMLA usage/leave.

28. Baffled, Jackson immediately attempted to determine the reason for UP's charges, investigation and his removal from service. He first attempted to solicit the information from management, but the same manager who testified at Jackson's Union hearing that he was provided details on or about September 6, 2018 surrounding Jackson's September 1st leave and the investigator's report in order to process Jackson's discipline and charge (Larry Vogel/charging manager) claimed to Jackson after Jackson had already been charged with dishonesty and misreporting FMLA use on September 11, 2018, that he did not know the reasons that Jackson was being taken out of service without pay.

29. Ultimately, Jackson requested help from his Union steward who requested documentation from UP to determine the cause of the investigation and removal.

30. Upon receipt of Jackson's FMLA file in September 2018, Jackson realized for the first time that his doctor had failed to request approval for self-treatment as his doctor had historically requested and which UP had historically approved over the last four years, at least. Instead and unbeknownst to Jackson until after his September 1, 2018 leave, Dr. Eapen erroneously indicated in Jackson's July 2018 FMLA paperwork that Jackson only needed FMLA

leave for doctor-based treatment.

31.     Straightaway, Jackson contacted his doctor who immediately acknowledged and corrected her error by providing Jackson with documentation confirming that his disability required that he be able to self-treat. Upon receiving the corrected information, Jackson and Union steward Buddy Piland approached Superintendent Brian Gordon regarding the information discovered to explain Jackson's doctor's error and Jackson's misunderstanding of his FMLA approval from July of that year but Superintendent Gordon refused to accept Jackson's explanation or information. Instead, Gordon told Jackson, "save it for the hearing."

32.     On October 4, 2018, a hearing was held to determine whether UP's charges against Jackson would be upheld.  During the hearing, UP's FMLA administrator testified:

- That Jackson was determined to be a candidate for surveillance because "he laid off FMLA over Labor Day weekend in 2016 and 2017. If he laid off FMLA in 2018 over that same weekend, I was likely going to initiate a surveillance opportunity which occurred."
- That she did not know whether Jackson had been granted intermittent FMLA self-treatment since 2014-2018.
- That UP granted Jackson intermittent FMLA as a treatment-only case beginning in August 2018.
- That UP did not give Jackson an opportunity to explain his FMLA usage or disability before recommending that he be disciplined.
- That UP never requested that Jackson provide supporting information or documentation for his FMLA usage in the past nor warned him that UP believed that he was using his FMLA incorrectly or abusing it.

33.     During the hearing, Jackson testified:

- That he had been living with Type 1 diabetes, insulin dependent for the last 14-15 years.
- That from 2014-2017, UP had granted him intermittent FMLA for both treatment by a physician and for self-treatment in case he had a hyperglycemic or hypoglycemic event.
- That he reapplied for intermittent FMLA in 2018 for the exact same health condition as he had in previous years.
- That he faxed the FMLA paperwork that Dr. Eapen completed to UP in July 2018.
- That he received an approval letter from UP in 2018.
- That he did not realize until after September 6, 2018 that his July 2018 intermittent FMLA approval was incorrect and stated for treatment only for only 8 hours each month.
- That his blood sugar level spiked above a healthy range on September 1, 2018.
- That his disability/diabetic condition required that he self-treat on September 1, 2018.

- That he did not visit with a doctor on September 1, 2018.
- That subsequent to discovering the errors in his 2018-2019 FMLA certification, he retrieved a letter from his physician correcting her request for FMLA approval to self-treatment when necessary, which he submitted to UP to demonstrate his need for FMLA leave on September 1, 2018

34.  In addition to providing his doctor's corrected request for FMLA leave that would allow Jackson to self-treat as needed during UP's hearing, on October 5, 2018, Jackson also submitted his doctor's corrected FMLA request to UP through its Health and Medical Services Department.

35.  Nonetheless, eight days after the hearing, on October 12, 2018, UP upheld the charges initially brought against Jackson and terminated Jackson's employment as a conductor. UP alleges that it terminated Jackson for (1) Engaging in dishonest conduct (Rule 1.6) and (2) Misreporting FMLA usage/leave (Rule 1.16) but Jackson's facts demonstrate that UP discriminated against Jackson and shattered his livelihood while doing so. Since UP fired him, Jackson has been unable to find work.

## IV.
## CAUSES OF ACTION

**A.     Interference, Discrimination and Retaliation in Violation of The FMLA**

36.  The foregoing paragraphs are incorporated herein as if recited verbatim for all causes of action set forth below:

37.  Section 2612(a)(1) of the FMLA entitles employees to up to twelve weeks of leave during any twelve-month period for certain reasons including the employee's own serious health condition.

38.  Defendant's discriminatory and retaliatory treatment of Plaintiff based on his request(s) for medical leave and his actual medical leave under the FMLA violate the FMLA.

39. Defendant's interference with Plaintiff's protected leave under the Act violate the FMLA.

40. At all times relevant to the facts and causes set forth by this Complaint, Jackson was an eligible employee under the FMLA, Defendant was an employer as defined by the FMLA, Jackson was entitled to the leave about which he complaints, he gave notice to Defendant of his intention and right to leave, Defendant denied him benefits to which he was entitled under the FMLA and terminated his employment.

41. Section 2615(a) forbids an employer from retaliating against employees for exercising their right to take the statutorily protected leave.

42. Union Pacific retaliated against Jackson for exercising his FMLA rights when it, among other things, charged him with workplace rule violations for using FMLA leave and removed him from service for supposed violations, forced him to defend himself from such charges and ultimately terminated his employment for the supposed rule violations.

43. Defendant's acts of interference, discrimination and retaliation were intentional, continuous and done in bad faith in spite of Plaintiff's protected status and rights. Defendant, through its agents, supervisors and/or employees, discriminated against Plaintiff based on his FMLA requests and FMLA leave, which led to the diminution and impairment in whole or part, of his wages, benefits, promotions, privileges, and terms and conditions of employment. The above-described acts of Defendant's part caused Plaintiff substantial injury and damage.

44. As a direct and proximate result of Defendant's willful, knowing and intentional discrimination against him, Plaintiff has suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish. Plaintiff is thereby entitled to general, compensatory and liquidated damages in amounts to be proven at trial.

45. As herein also alleged, Defendant subjected Plaintiff to retaliation in the form of unwarranted scrutiny, discipline, a loss of benefits and termination.

46. Further, Defendant had no legitimate business reasons for any of its acts of discrimination, interference and/or retaliation.

47. The above-described acts on Defendant's part were undertaken in violation of the FMLA and its anti-retaliation regulations, which proximately caused Plaintiff substantial injuries and damages.

**B.** **Discrimination pursuant to The Americans with Disabilities Act as Amended**

48. Plaintiff repeats and re-alleges by reference each and every allegation contained in the paragraphs above and incorporates them here as though fully set forth.

49. Plaintiff is a qualified individual with a disability (type 1 diabetes). Additionally, Plaintiff has a history and record of disability and/or Defendant perceived him as disabled and/or as having a record of disability.

50. Defendant, through its agents, supervisors, or employees violated Plaintiffs civil rights in violation of the Title I of the Americans With Disabilities Act ("ADA"), by intentionally interfering with Plaintiff's employment because of his medical condition, history and record of disability and the perception of same including refusing to reasonably accommodate him and refusing, in good faith, to engage in the interactive dialogue concerning his disability and resulting limitations, among other things.

51. Here, Defendant violated Plaintiff's rights under the ADA by discriminating and harassing him based on his disability and symptoms of his disability, and/or his record of disability.

52. Further, the failure of UP to consider a reasonable accommodation, such as a policy exception, in light of Plaintiff's disability was a violation of the law.

53. Union Pacific further discriminated against Jackson by charging him with a workplace rule violation for using FMLA leave and removing him from service for supposed violations, forcing him to defend himself from such charges and ultimately terminating his employment for a supposed rule violation despite knowing about the existence of his disability and its resulting symptoms and Jackson's requests for accommodation.

54. Further, Defendant's discrimination, through its agents, supervisors, or employees, led to the loss and impairment in whole or part, of the wages, benefits, promotions, privileges, and terms and conditions of Plaintiff's employment.

55. Defendant's acts were malicious, reckless, and intentional and consisted of discrimination of a continuous nature.

56. As a direct and proximate result of Defendant's willful, knowing and intentional discrimination against him, Plaintiff has suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish and emotional distress. Plaintiff is thereby entitled to general, compensatory and liquidated damages in amounts to be proven at trial.

## V.
## DAMAGES

57. Because of Defendant's discrimination, retaliation and interference, Plaintiff has suffered, suffers, and will continue to suffer economic losses including past and future lost wages and benefits as well as humiliation, mental anxiety and stress, and other damages. Accordingly, Plaintiff seeks all general, special, incidental, liquidated and consequential damages all of which amounts will be proved at trial.

58. Additionally, because of Defendant's unlawful and discriminatory conduct, it has been necessary for Plaintiff to retain the undersigned attorney to represent him in the causes of actions set forth herein. Further, Plaintiff has agreed to pay his attorney reasonable attorney's fees for the

preparation and trial of these causes.

59. As a further consequence of Defendant's unlawful and discriminatory conduct, Plaintiff has incurred out-of-pocket expenses, which include litigation costs and other expenses to preserve his ability to earn a living. Accordingly, Plaintiff seeks all general, special, incidental and consequential damages as shall be proven at trial.

60. Plaintiff also seeks pre-judgment interest at a rate commensurate with the actual rate of interest in the marketplace or, alternatively, the statutory rate of interest because of the delay in receiving the damages and to avoid unjust enrichment to Defendant. Plaintiff also seeks post-judgment interest at the maximum rate allowed by law in the event that Defendant does not promptly tender damages assessed against it and to avoid unjustly enriching Defendant.

## VI.
## JURY DEMAND

61. Plaintiff requests a trial by jury in this matter.

## VII.
## PRAYER

WHEREFORE, premises considered, Plaintiff prays that Defendant be required to appear and answer his Original Complaint, and that on final trial, Plaintiff be awarded judgment against Defendant for:

a. All liquidated and unliquidated damages to which Plaintiff proves he is entitled pursuant to this Original Complaint and the causes of action set forth herein, any amendments thereto with interest;

b. Actual damages within the jurisdictional limits of the Court;

c. Exemplary and/or punitive damages as allowed by law.

d. Reasonable and necessary attorney's fees, as allowed by law;

e. Pre and post-judgment interest, as allowed by law;

f.  Costs; and

g.  Any and all other relief to which Plaintiff may be justly entitled.

                                          Respectfully submitted,

                                          /s/ *Marjorie A. Murphy*
                                          Marjorie A. Murphy
                                          Attorney-In-Charge
                                          State Bar No. 24013218
                                          Federal Bar No. 34512
                                          The Murphy Law Practice, PLLC
                                          3355 W. Alabama, Ste. 670
                                          Houston, Texas 77098
                                          Telephone:  (832) 564-3804
                                          Facsimile:  (832) 553-7441
                                          Email:marjorie@themurphylawpractice.com
                                          **ATTORNEY FOR PLAINTIFF,**
                                          **BRONSON JACKSON**